THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HAROLD WILLIAMS, Defendant-Appellant.

First District (4th Division)   No. 1—87—0416

Opinion filed May 24, 1990.

Paul P. Biebel, Jr., Public Defender, of Chicago (Crystal H. Marchigiani, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Kevin Sweeney, William B. Schiller, and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1(a)). He was sentenced to a

term of natural life imprisonment without parole for the murder conviction, to be followed by a consecutive sentence of 30 years for the attempted murder conviction. On appeal, defendant contends that: (1) the trial court erroneously determined defendant had not made a *prima facie* showing that the State utilized peremptory challenges to exclude blacks from the jury in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; (2) the State deprived defendant of a fair trial when it positioned a police "mug book" containing defendant's photograph so that the photograph and police legend would be in plain view to the jury during trial; (3) the trial court erroneously excluded a photograph taken of defendant after his confession, offered by defendant to show that his confession was coerced by police officers; and (4) the trial court erroneously sentenced defendant to a term of natural life imprisonment because of an improper finding that the murder was brutal and heinous. We remand for further proceedings with respect to the State's use of peremptory challenges in jury selection, but otherwise affirm the trial court's judgment.

Defendant's convictions arose from an incident occurring on July 28, 1985. On that date, J.M. boarded a bus at approximately 2 a.m. intending to return to her home, which she shared with her grandmother. J.M. met defendant on the bus and they talked and exchanged names and addresses. Defendant walked J.M. home, and she invited him into the house. While defendant was still in the home, J.M. fell asleep.

In a signed statement given to police during interrogation following his arrest, defendant admitted that he stabbed J.M.'s grandmother after J.M. had fallen asleep. J.M. testified at trial that she awoke, saw that her grandmother was hurt, and saw defendant holding a pocket knife and standing in front of her grandmother. J.M. also testified that defendant then told J.M. to remove her clothes, took her into a bedroom, and forced upon her acts of criminal sexual assault. J.M. testified that defendant then left the apartment, taking some silver jewelry from a table as he departed. He returned shortly thereafter to retrieve his hat and comb, and left the residence. J.M.'s grandmother later died of a stab wound to her back.

J.M. identified defendant's photograph among a set shown to her by Chicago police officers on July 31, 1985. Defendant was arrested approximately a week later and gave an oral and written inculpatory statement to officers regarding his involvement in the incident. Based upon this evidence, defendant was convicted and sentenced as previously noted, and now appeals.

Defendant argues first that the trial court erred in its conclusion that defendant had not made a *prima facie* showing that the State utilized its peremptory challenges to exclude blacks from the venire in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, which was decided before defendant's case came to trial.

■ The Illinois Supreme Court has set forth the following guidelines with respect to a defendant's claim of a *prima facie* case in the State's use of peremptory challenges:

"To establish a *prima facie* case of discrimination under *Batson*, a defendant must first show that 'he is a member of a cognizable racial group' and that the State has utilized 'peremptory challenges to remove from the venire members of the defendant's race.' The defendant may then 'rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." ' The defendant must then 'show that these facts *and any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' (Emphasis added.) (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723, quoting *Avery v. Georgia* (1953), 345 U.S. 559, 562, 97 L. Ed. 2d 1244, 1247-48, 73 S. Ct. 891, 892.) In deciding whether the defendant has established a *prima facie* case, 'the trial court should consider *all relevant circumstances.*' (Emphasis added.) *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 88, 73 S. Ct. at [1723].

In light of the Supreme Court's instructions in *Batson*, this court has repeatedly emphasized that in determining whether a *prima facie* case of discrimination exists, a 'court must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged.' [Citations.] Instead, a court must consider other relevant circumstances. These circumstances may include, but are not limited to, the following:

'[A] "pattern" of strikes against black jurors; "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges" [citation]; the disproportionate use of peremptory challenges against blacks [citations]; the level of black representation in the venire as compared to the jury [citations]; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and

victim [citations]; and the race of the witnesses [citation].' (*People v. Evans* (1988), 125 Ill. 2d 50, 63-64.) Another factor which a judge may consider is the conduct of the prosecutor in previous cases. [Citation.]" *Holman*, 132 Ill. 2d at 172-73.

See also *People v. Harris* (1989), 129 Ill. 2d 123, 173-77, 544 N.E.2d 357.

■ Applying these guidelines to the case at bar, we conclude that the record reveals a *prima facie* case of racial discrimination in the State's use of peremptory challenges. Our conclusion is based, first, upon the State's disproportionate use of peremptory challenges against blacks. Although 13 of the 36 prospective jurors were black, *i.e.*, approximately 33% of the venire, the State exercised eight of its nine peremptory challenges to exclude black jurors, and only one was chosen to serve on the jury (approximately 8%). White prospective jurors, in comparison, number 18 of the venire (*i.e.*, approximately 50%), yet the State used only one peremptory challenge to exclude a white person, and defendant's jury was composed of seven whites (approximately 59% of the final jury composition). Defendant utilized three peremptory challenges to exclude prospective black jurors. Thus, the disparate racial composition of the jury did not result from a marked difference in the number of black and white prospective jurors, but from the State's use of almost all of its peremptory challenges to exclude prospective jurors who were black.

Our holding is also based on the circumstance that the black prospective jurors challenged by the State were a heterogeneous group whose only common characteristic was their race. The eight blacks excused by the State were as follows (we note that juror Annie S. was also challenged by defendant):

Tyrone R., a 22-year-old, who lived in a southern suburb, had worked for a year as a child attendant for a public school, for six months as an orderly in a nursing home, and for three years at a department store warehouse. He had never previously served on a jury, knew no one who worked in law enforcement or in law in any capacity, and his only personal exposure to crime had occurred a month and a half earlier when a family member's purse had been stolen.

Marcia W., who lived on the south side of the City of Chicago and had worked for the last 8½ years as an associate programmer analyst with a city newspaper. Her husband had been a mail handler for almost 20 years. She knew no one who worked in law enforcement and had never before been on a jury. Her

mother's purse had been taken about 10 years earlier.

Patrick S., who lived on the south side of the City of Chicago, was unemployed but had worked as a clerk typist for a little over a year. He had a cousin who was a security guard, although he did not know the name of the company and never talked to him about his work. This was his first time on a jury, and he knew no one who had ever been a victim of or charged with a crime.

Annie S., who lived in southeast Chicago and worked as an assistant housekeeping supervisor with a company where she had worked for 10 years. Her husband was a factory worker, and no family or close friends were in the field of law or law enforcement. She had five adult children. Neither she, nor any family member or close friend, had ever been the victim of a crime, or charged with a crime.

Robert I., who lived in south Chicago, and although unemployed for the last year, had worked the previous 15 years as a truck driver. He stated that his brother was a security guard at a department store, but that this would not affect his ability to be impartial. He was married, his wife had been employed as a clerical worker, and he had two children. He had never before served on a jury. He stated that his brother had been robbed at gunpoint "one time in the projects" about two years earlier and that the incident would not affect his ability to be impartial.

Janise K., who lived in south Chicago, and although currently unemployed, had worked seasonally as a program coordinator with the city for three years. Prior to this employment, she had worked as a literacy instructor and at the post office and a hospital for seven years. Her husband worked as a collector and more recently in consumer services, and she had two children. She stated that she had two close friends in law enforcement, that her brother worked in corrections at a juvenile court, and that she had not discussed their employment with them. She also said that she had gone to school for criminal justice as an undergraduate major and that she had been given probation about five years ago in a criminal case. She also informed the court that her house had been burglarized earlier in the year and that some family members had been the victims of minor crimes.

Hattie S., from south Chicago, who was not working at present, although had worked almost 30 years at factories. She

was married, had two adult children, and said that her husband "does trucking rigs." She stated that she had a cousin who was a police officer in the suburbs, that she never talked to him about his job, and that she would be able to remain impartial. She had never previously served on a jury. She also informed the court that eight years ago she had been beaten and robbed. She stated some hesitancy about returning a guilty verdict unless the proof of the defendant's guilt were very clear, but assured the court that she would sign a guilty verdict if the State proved its case beyond a reasonable doubt.

Janette P., who lived on the south side and had been a teacher's aide for almost 17 years and whose husband worked as a security guard. No member of her family or close friends were employed in the field of law or law enforcement. Two of her children were still at home, and five were adults. No member of her family or close friends had ever been the victim of a crime, nor had any been charged with or convicted of a crime.

As this listing shows, the blacks excused by the State were men and women of varied ages and backgrounds. Some were married, while others were not. Certain of the jurors had been gainfully employed for several years up to the date of trial (Marcia W., Annie S., Janette P.), others had only begun their working careers (Tyrone R., Patrick S.), and still others were unemployed at the time of trial (Robert I., Janise K., Hattie S.). Several knew no one who either worked in law or law enforcement, had been the victim of a felony, or had been charged with or convicted of a crime (Tyrone R., Marcia W., Patrick S., Annie S., Janette P.). It appears that none had ever previously served on a jury. Thus, the only common denominator among the group was that all of them were black.

In addition, the nonblack prospective jurors chosen to serve at defendant's trial shared characteristics with the black jurors excluded by the State. For example, one juror at defendant's trial, Cynthia V., had been working as a mail clerk for the previous six years. Her husband was an unemployed driver. She knew no one who worked in law enforcement or who had been the victim of or charged with a crime, and it was her first time to serve on a jury. Another juror who served at defendant's trial, Patricia P., had worked for 10 years as a law librarian and was married. She stated that one of her brothers-in-law was a police officer and another was a probation officer, but that she never talked to them about their work. Although Patricia P.'s purse had been taken about a year ago and items had been stolen from her yard as well as the yards of her neighbors, she had no other family

556

members or close friends who had been victims of crimes. In these respects, Cynthia V. and Patricia P. were similar to Marcia W., Annie S., and Janette P., all of whom were excluded by the State.

Also, several of the nonblack persons who served on the jury at defendant's trial had either been convicted of a crime (Andrew B., who had been arrested for auto theft when he was a teenager; James D., who had been convicted of battery and given one year's supervision as a teenager; Ramon G., who had been convicted of drunken driving 15 years ago, given one year probation with a three-year license suspension, and informed the court that this occurred because he "had no lawyer. I had no money to do it. They would not appoint me one so they discriminated me otherwise [*sic*]"). Only one of the black jurors excluded by the State had a criminal conviction (Janise K., probation).

■■ ■ The State asserts that there was no *prima facie* showing of racial discrimination in the instant cause because one of the jurors and one alternate juror were black. However, it has been "repeatedly held that the presence of blacks on the jury does not preclude the court from finding that the defendant has established a *prima facie* case of discrimination." (*People v. Harris* (1989), 182 Ill. App. 3d 114, 119, 537 N.E.2d 977, citing *People v. Seals* (1987), 153 Ill. App. 3d 417, 505 N.E.2d 1107; *People v. Johnson* (1986), 148 Ill. App. 3d 163, 498 N.E.2d 816; *People v. Kindelan* (1986), 150 Ill. App. 3d 818, 502 N.E.2d 422.) The State also notes that the possibility of prejudice to the defendant was less in this case, because the victim and the defendant were both black. Nevertheless, we find the commonality in race between the defendant and victim insufficient basis to destroy the inference of unlawful discrimination presented in the case at bar, given the great disparity in the State's use of peremptory challenges to exclude black as compared to white jurors, the predominantly white composition of the jury, and the heterogeneity of the excluded black jurors.

■■ We are also not persuaded by the State's argument that the black jurors were challenged for reasons other than race that related to their lack of employment or possible bias regarding the criminal justice system. These justifications were never given by the prosecutor at defendant's trial, since the trial court refused to require the prosecutor to give his reasons for the use of peremptory challenges of the black venire. Consequently, we cannot determine on this record that the State had legitimate, nondiscriminatory reasons for its peremptory challenges of the excluded black jurors. As the Illinois Supreme Court emphasized in *People v. Harris* (1989), 129 Ill. 2d 123,

544 N.E.2d 357, "a court should not presume, or infer from the facts of the case, that an unarticulated neutral explanation exists. [Citation.] Rather, a court must focus its inquiry on the reasons actually articulated by the State." 129 Ill. 2d at 184; see also *Harris*, 129 Ill. 2d at 194 (Ryan, J., concurring in part and dissenting in part) ("although the record may disclose an explanation for the exercise of a challenge, that explanation cannot be found to be adequate by either the trial court or a court on review, unless the prosecutor articulated that as a reason for exercising a peremptory challenge").

■■ We caution that our conclusion is not based exclusively on the number of peremptory challenges used by the State to exclude blacks. Rather, as in *People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357, our determination is also based on other relevant circumstances appearing in the record, including the notably different racial composition of the venire as compared to defendant's petit jury, and the heterogeneity of the black prospective jurors excluded by the State. Thus, upon a consideration of all the relevant circumstances surrounding *voir dire* at trial, we conclude that the record discloses a *prima facie* case that the State exercised its peremptory challenges to exclude blacks from the jury serving at defendant's trial, in violation of *Batson*. Accordingly, we remand the instant cause to the circuit court for further proceedings wherein the State will be required to provide race-neutral explanations for its use of peremptory challenges, and wherein the trial court shall make specific factual findings of whether these reasons were a pretext for unlawful discrimination.

■■ Having disposed of defendant's *Batson* argument, we turn to defendant's claims regarding the fairness of his trial. Defendant argues first that the State deprived him of a fair trial when it positioned a police "mug book," containing defendant's photograph, on the prosecutor's table so that the photograph and police legend would be in plain view to the jury during trial. The record shows that the book remained in this position only a few seconds, whereupon defendant objected. The trial court ordered the State to close the book and denied defendant's request for a mistrial. Defendant did not renew this objection in his post-trial motion, and the question is therefore waived on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) In light of the overwhelming evidence of defendant's guilt, we cannot say that the State's placement of the book amounted to plain error, or that it was so prejudicial to defendant that he should receive a new trial.

■■ Defendant also asserts that the trial court erroneously excluded a photograph taken of defendant after his confession. The

defendant offered the photograph to show that his confession had been coerced by police officers. We find no error in the trial court's ruling. The trial court determined that the injuries depicted in the photograph were superficial abrasions. We accept this assessment since the photograph is not included in the record on appeal. Also, the offer of proof made by defense counsel on this issue indicates that the photograph was taken approximately 30 hours after defendant gave his court-reported statement to police authorities, and there was no evidence at trial to indicate the source of the injuries displayed in the defendant's photograph. Accordingly, defendant did not lay a proper foundation for the admission of the photograph into evidence. See, e.g., *People v. Donaldson* (1962), 24 Ill. 2d 315, 181 N.E.2d 131.

▮ Defendant's final argument pertains to the sentence imposed by the trial court. Defendant asserts that the trial court erroneously sentenced defendant to a term of natural life imprisonment because of an improper finding that the murder he committed was brutal and heinous. The record indicates that the trial court did not base the natural life sentence exclusively upon a finding of brutality or heinousness. The trial court imposed natural life imprisonment for the additional reason, justified under Illinois law, that defendant was eligible for the death penalty because he had committed the murder during the course of an aggravated criminal sexual assault. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b) (aggravating factors in murder conviction rendering a defendant eligible for death penalty include committing the murder during aggravated criminal sexual assault).) As a result, the trial court's selection of natural life imprisonment was an appropriate exercise of the court's discretion in the instant cause. See generally *People v. La Pointe* (1982), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 308 N.E.2d 882.

For the reasons stated, the judgment of the circuit court is remanded with directions to hold a *Batson* hearing wherein the State will provide the bases for its peremptory challenges of the black prospective jurors excluded by the State during *voir dire*. If the trial court determines on remand that the State excluded any of the black prospective jurors because of race, the defendant shall receive a new trial. If the trial court finds on remand that the State did not use its peremptory challenges to exclude black prospective jurors because of race, the defendant's conviction shall stand affirmed.

Remanded with directions.

JOHNSON and LINN, JJ., concur.