THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BERNARD LOCKHART, Defendant-Appellant.

First District (5th Division)   No. 1—87—1999

Opinion filed July 27, 1990.

Randolph N. Stone, Public Defender, of Chicago (Michael Halloran and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Renee Goldfarb, and Joseph G. Howard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, Bernard Lockhart, was tried by a jury and found guilty of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)),

but found not guilty of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)). He was sentenced to a term of 30 years' imprisonment. On appeal, he contends that the trial court erred: (1) in failing to conduct a *Batson* hearing; and (2) in refusing to give a voluntary manslaughter instruction. For the reasons hereinafter set forth, we remand with directions.

## THE VOIR DIRE

On May 8, 1986, the trial court conducted a *voir dire* examination of prospective jurors. The venire consisted of 60 individuals, but the 12 jurors and 2 alternates were selected from the first 32. During the *voir dire*, defendant, who is black, exercised his peremptory challenges to excuse seven prospective jurors, each of whom was white. The State, likewise, peremptorily challenged eight prospective jurors. Of those eight, five were black and three were white. Of the selected jurors, one was black while the remaining 11 jurors and two alternates were nonblack. The court discharged two black veniremen for cause. The record does not disclose the racial composition of the remaining 28 venire members.

The black prospective jurors challenged by the State were:

(1) Van Merideth, a male, who was single and was a student at a two-year city college. He had no prior jury service, knew no one who worked in law enforcement or in any law-related field, and had no reservations about the death penalty. He and his friend were "jumped on a[n] 'L' " platform by some gang members. Two gang members were subsequently charged with attempted robbery.

(2) Betty Daniels, a female, who was single and was an employee of Peoples Gas, had never served on a jury. She knew no one who worked in law enforcement and had no reservations about the death penalty. She and members of her immediate family had never been victims of crime.

(3) Gordon Ulishious, a male, who was single and had just completed a "course of study" as a student, had likewise never served as a juror. He had a cousin who was a police officer and his only personal exposure to crime occurred about two years ago when a radio was stolen from his automobile. His sister's apartment was broken into approximately 11 years ago. He had reservations about the death penalty, but stated that he would consider all the possible penalties, including the death penalty, if the defendant was found guilty.

(4) Harold Williams, a male, who was single and was an employee of U.S. Steel. He had never served as a juror and knew no one who worked in law enforcement. He was involved in a civil lawsuit 15

years ago. He was a victim of crime 15 years ago, when he was robbed at gunpoint. His niece was also robbed on an "L" platform approximately five years ago. He had no reservations about the death penalty.

(5) Charlene Chandlers, a female, who was unemployed, had never served as a juror and knew no one who worked in law enforcement. She had never been a victim of crime, but one of her brothers was once beaten by some assailants.

The white prospective jurors challenged by the State were:

(1) Michelle McCormick, a female, who worked as an interior designer, had not served on a jury before. She knew no one who worked in law enforcement or in law-related fields. Her friend's car was broken into and she had not formed an opinion on the death penalty.

(2) Deborah Dolinsky, a female, served as a juror in a criminal case in Cleveland, Ohio. A member of her family had once been a party to a civil lawsuit. Her brother-in-law was a lawyer and her stepbrother was a judge in Sonoma, California. She had once been "robbed" and had also been involved in a "hit and run" with a drunken driver in Cleveland. She stated that the police officers investigating the hit-and-run incident never followed up on their investigation. She had "some trouble" with the death penalty, but stated that she would consider all the possible penalties, including the death penalty, if the defendant was found guilty.

(3) Phyllis Hager, a female, had never served as a juror, nor did she know anyone in law enforcement. Her only exposure to crime occurred approximately eight years ago when her purse was stolen. She had "strong feelings" against the death penalty, but stated that she would consider all the possible penalties, including the death penalty, if the defendant was found guilty.

On that same day, three panels, each consisting of four jurors, were separately selected and sworn without objection from the defense, as were two alternate jurors. Four of the selected 11 nonblack jurors had themselves either been victims of crime, or had immediate family members who were victims of crime. They were:

(1) Karen Pedtke, a female, who was an office manager, stated that she had been burglarized 2½ years ago.

(2) Carolyn Mir, a female, who was a teacher, also stated that she had been burglarized and that the "grill" on her automobile was stolen. No one was ever apprehended for either of those crimes. When she was asked if those experiences would affect her ability to sit as a juror, she responded by saying "possibly."

(3) Mr. Yu stated that his car was stolen and that he had a friend

who was robbed. He also stated that he had once encountered abusive police officers.

(4) Cheryl Wade, a female, who worked in a refinery, stated that her parents' car was stolen, but that it was subsequently recovered.

Moreover, 3 of those 11 selected nonblack jurors, which included one who was also counted as a crime victim, had some degree of reservation about the death penalty. They were:

(1) Karen Pedtke stated that she had "strong feeling" against the death penalty.

(2) Mary Dugan, who was married, stated that she had reservations about the death penalty.

(3) Judith Everhart, who was married, stated that she had mixed emotions about the death penalty.

On the following day, May 9, before the jury was to be sworn in as a whole, but after three panels and two alternates were separately sworn, defendant first moved for a mistrial on the ground that the State had exercised its peremptory challenges to systematically exclude blacks from the jury. In response, the State argued that defendant had not established a *prima facie* case of discrimination and, therefore, the burden had not shifted to the State to come forward with race-neutral reasons for its peremptory challenges of black prospective jurors. The State pointed out that of the eight prospective jurors peremptorily challenged, three were white and, also, that a black juror had been selected.

In concluding that a *prima facie* case of discrimination had not been established, the trial court stated:

> "Well, I think Batson says its [*sic*] a systematic exclusion here. They stated there were five blacks and three whites excluded, and that's five-eights [*sic*] and three-eights [*sic*]. The defendant excused seven white jurors, and I don't think you have made out a prima facie case, however, of exclusion. I think that means 100 percent exclusion."

### THE TRIAL

During the trial, several witnesses testified on behalf of the State. Jeanine Dilworth, who lived with the defendant, testified that on September 23, 1984, she saw the victim, Darrette Maxie, who is black, standing outside waiting for the defendant. She then invited him into the apartment which she shared with the defendant. Jeanine testified that the victim was a friend of the defendant whom she had previously met through the defendant. They were together in the apartment for approximately 15 minutes when defendant arrived. Defend-

ant and the victim went into the kitchen to drink and talk. Melvin, another friend of the defendant, came by and then the three men left the apartment together.

The victim returned to the apartment alone 15 minutes later and expressed his concerns to Jeanine about the defendant's use of narcotics. Defendant returned 45 minutes thereafter. She testified that, upon defendant's return, he and the victim talked in the kitchen and then in the bathroom for about 10 minutes outside of her hearing. When they reappeared in the kitchen, she heard the victim trying to talk to defendant while defendant pointed to a gold chain around the victim's neck. She heard the victim offer to give the defendant the chain if he agreed to talk to him. She then saw the victim give defendant the chain, who placed it in a glass jar.

The victim asked to take defendant for a ride in order to talk to him. Defendant agreed. But as the victim stepped outside, defendant attempted to shut the door behind him, while he remained inside. The victim kept thwarting defendant's attempts to shut him out of the apartment by putting his foot in the door and asking to be let back inside. Defendant acquiesced and, when the victim was allowed back in, they talked about the gold chain. The victim then took his chain back from defendant. At this point, defendant asked the victim to leave, and as he got to the door, defendant pulled on the victim's jacket, and in response, the victim held the defendant by his arms. The victim then left the apartment, saying he would not come back unless defendant called him, but defendant responded by again asking him to leave. After the victim left, defendant went to his closet, pulled out a gun, and ran after the victim. The victim was about three inches taller and 10 pounds heavier than defendant. Jeanine testified that she heard two gunshots and then went to a neighbor's house to call the police.

David Eldridge, a neighbor, who lived in apartment 3c, which was immediately adjacent to the defendant's apartment, testified that on September 23, he heard "some commotion" coming from defendant's apartment. He testified that he saw a man running out of that apartment, and also saw a hand extending out of the door. In that hand was an object that looked like a gun. He then opened the door to the hallway and saw Jeanine standing with her daughter. He offered some help and tried to comfort her because she appeared to be upset. Eldridge testified that at this point, he heard two gunshots. He then returned to his apartment with Jeanine, called the police, and then went out to look for defendant. When he got to the Saranac Hotel, a janitor directed him to the side of the building. As he was walking, he

heard more gunshots. He saw a body lying on the ground and recognized the individual as the same man he saw running out of defendant's apartment.

Peter Vanvliet, a neighbor of defendant, testified that on September 23, he heard screaming and shouting on the street so he looked out his window. He saw two men running on the street. The shorter of the two men was chasing the other man. Vanvliet further testified that the man who was being pursued fell in the middle of the street. He heard a gunshot.

According to Vanvliet, the man who fell down, got up and ran between some parked cars. The shorter man continued firing shots over the cars. The chase continued into the Saranac Hotel. While those individuals were in the hotel, Vanvliet heard another gunshot. He then saw the shorter man casually walk out of the hotel.

Joseph Bogdalek, a Chicago police detective, testified that following defendant's arrest, defendant was admonished of his constitutional rights and he gave a statement of the events that occurred on that day. Defendant stated that he believed that Jeanine and the victim had sex prior to his arrival, and that although both were fully clothed, the victim was not wearing his jacket and was perspiring. Defendant also stated that the victim grabbed him by the neck and started choking him. He then chased the victim with his gun. While they were on the street, he fired two shots at the victim, and when they entered the hotel, he fired another shot. Finally, when they got into an alley, he fired two more shots, at which time the victim fell to the ground. David Stoioff, an assistant State's Attorney, testified that defendant gave essentially the same statement that he had given previously to Detective Bogdalek.

Defendant testified on his own behalf. He stated that he had known the victim for approximately five years and that the victim came to his house frequently. On September 23, he spoke to the victim in the morning and arranged to meet him so that he could pay back a debt. When he arrived home later on in the day, he met the victim in his apartment. He called his friend Melvin, and when Melvin arrived, all three men drank alcoholic beverages and smoked marijuana. Defendant showed both men some gold chains and permitted the victim to try one on. When they were about to leave the apartment, defendant asked the victim to return the gold chain, and after momentarily arguing with defendant, he removed the chain and gave it back to defendant. Defendant put the chain in a glass jar. The victim then informed defendant he was going home, and defendant left the apartment with Melvin to purchase some cocaine.

When defendant returned home, he was surprised to see the victim in the apartment. The victim was then sitting on the couch with his jacket and shoes off. Jeanine was sitting beside him on the same couch. She was fully dressed, but wore her house shoes. Defendant testified that when he approached the victim, he appeared nervous and scared. They began to argue and the victim grabbed defendant by the collar and defendant pushed him away. The victim again grabbed defendant and started to choke him. Thereafter, in response to defendant's request to leave the apartment, the victim went to the door. Defendant twice attempted to push the victim out of the door, but each time, the victim kept putting his foot in the door. He again ordered the victim to leave the apartment. Defendant testified that he then became very angry because he knew that Jeanine and the victim were doing something, and that he always suspected the victim of "try[ing] to mess with [Jeanine]." Defendant stated that the victim walked towards him, grabbed some gold chains and started to try them on. Defendant again told him to get out of the apartment and at this point ran to the closet and got his gun. The victim ran out of the apartment with defendant in pursuit.

He chased the victim down a street and into a hotel. He continued firing shots at him. In the hotel, the victim jumped over a counter and went through a side door. Defendant followed him into an alley and fired more shots. The victim fell to the ground. Defendant confirmed that the victim was not moving and then reached down and grabbed the chain from his neck. Defendant went back to his apartment.

On cross-examination, defendant testified that he did not see the victim kissing Jeanine but that, although he was intoxicated that night, he surmised what the victim was doing with Jeanine.

At the instruction conference, defendant proffered two voluntary manslaughter instructions, Illinois Pattern Jury Instructions, Criminal, Nos. 7.03 and 7.04 (2d ed. 1981) which were refused by the trial court. Defendant claimed that a voluntary manslaughter instruction was warranted because there was evidence of "serious provocation, to wit, adultery," a claim supplanted on appeal by the contention that the provocation was "mutual combat."

The jury found defendant guilty of murder but not guilty of armed robbery. Defendant was sentenced to a term of 30 years' imprisonment. Defendant appeals.

Defendant first contends that the trial court committed error when it refused to conduct a *Batson* hearing in that a *prima facie* case of discrimination had been established. Conversely, the State argues that defendant did not establish a *prima facie* case and, even if

he did, defendant waived that issue when he failed to make a timely objection before the jury was sworn. We first address the State's waiver argument.

■■ ■ Generally, a defendant's failure to make a timely objection to the State's use of peremptory challenges to exclude black venire members, before the jury is sworn, results in a waiver of that claim. (*People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025.) The waiver principle, however, applies with equal force to the State in that when the State responds to the merits of a defendant's *Batson* motion, rather than objecting to its timeliness, the State itself is deemed to have waived its right to object to the timeliness of that motion. See *Andrews*, 132 Ill. 2d at 458, 548 N.E.2d at 1028; *People v. Harris* (1989), 129 Ill. 2d 123, 171, 544 N.E.2d 357, 378.

In the present case, the record discloses that before the jury had been sworn as a whole, but after each of the three panels had been separately sworn, defendant moved for a mistrial on the ground that the State exercised peremptory challenges to exclude blacks from the jury. Rather than objecting to the timeliness of defendant's motion, the State challenged the motion solely on its factual merits by arguing that defendant had not established a *prima facie* case. By so doing, the State itself has waived its right to object to the timeliness of defendant's motion. Moreover, under the holding of *People v. McDonald* (1988), 125 Ill. 2d 182, 530 N.E.2d 1351, a *Batson* motion made after jury selection but before the entire jury is sworn is timely. (See *McDonald*, 125 Ill. 2d at 194, 530 N.E.2d at 1356.) We turn now to defendant's contention that the trial court should have conducted a *Batson* hearing.

■ The United States Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, held that a "defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722.) To establish a *prima facie* case of discrimination, defendant is required to show that: (1) he belongs to a "racial group capable of being singled out for differential treatment"; (2) the State removed members of his race from the venire by using peremptory challenges; and (3) these facts "and any other relevant circumstances raise an inference" of purposeful discrimination because of race. 476 U.S. at 93-96, 90 L. Ed. 2d at 85-88, 106 S. Ct. at 1721-23.

In the case at bar, defendant has satisfied the first two requirements of a *prima facie* case. Defendant is black and the State used

peremptory challenges to excuse members of defendant's race from the venire. Consequently, the remaining question is whether these facts and any "other relevant circumstances" raise an inference of purposeful discrimination.

As elaborated by our supreme court in *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, these "other relevant circumstances" include the following:

> "[A] 'pattern' of strikes against black jurors; 'the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges' [citation]; the disproportionate use of peremptory challenges against blacks [citations]; the level of black representation in the venire as compared to the jury [citations]; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and victim [citations]; and the race of the witnesses [citation]." (*Evans*, 125 Ill. 2d at 63-64, 530 N.E.2d at 1365.)

In considering these relevant circumstances in view of the facts of the present case, we conclude that the defendant did in fact establish a *prima facie* case of discrimination. Our ultimate conclusion is based upon our determination that there was a clear pattern of State strikes against black venire members, that there was a markedly disproportionate number of peremptory challenges used against blacks, and that the excluded black prospective jurors were a heterogeneous group, sharing race as their most significant apparent common characteristic. All of these factors in combination warrant a determination which would shift the burden to the State to explain the reasons for its challenges.

There is no question that there was a pattern of strikes against black venire members. The State's challenge of five out of six black venire members who were reached for *voir dire* and not excused for cause is enough to establish such a pattern. The exclusion of five of these six venire members does not appear to be random, coincidental or occasional so as to be devoid of possible racial motivation.

The record also clearly reflects a markedly disproportionate number of challenges against prospective black jurors. Although we do not know the racial composition of the entire venire, we do have the number and the racial composition of the 32 venire members reached for *voir dire*, the number of the peremptory challenges exercised, and the race of the challenged venire members.

In the present case, the record discloses that of the 32 venire members reached for *voir dire*, eight were black (25% of the venire

reached for *voir dire*). Despite this low black representation, the State still used five peremptory challenges against five of those blacks (approximately 63% of its challenges), with two blacks having been excused for cause, resulting in the selection of only one black juror (approximately 8%).

Conversely, there were 24 nonblack venire members who were examined and who were not excused for cause, yet the State used only three peremptory challenges (approximately 37%) against those 24 nonblack venire members who represented approximately 75% of the venire reached for *voir dire*. Thus, the disproportionate use of peremptory challenges against prospective black jurors is clearly demonstrated to be a factor which significantly contributed to the racial imbalance of the jury. See *People v. Williams* (1990), 199 Ill. App. 3d 549.

■ We acknowledge that in determining whether a *prima facie* case has been established, courts "should consider more than simply the number of jurors excluded." (*People v. Young* (1989), 128 Ill. 2d 1, 19, 538 N.E.2d 453, 457.) However, where the numbers reveal a racial imbalance resulting from the use of a disproportionate number of challenges against blacks, those numbers cannot be ignored and are, along with all the other circumstances, significantly relevant to our determination of whether a *prima facie* case was established. See *People v. Harris* (1989), 129 Ill. 2d 123, 172, 544 N.E.2d 357, 378 (State used 15 of 20 peremptory challenges to exclude blacks, 2 blacks were selected as jurors; *prima facie* case established); *People v. McDonald* (1988), 125 Ill. 2d 182, 196, 530 N.E.2d 1351, 1357 (16 of 18 blacks excused peremptorily; *prima facie* case established); *People v. Johnson* (1990), 199 Ill. App. 3d 798, 805 (six of seven challenges used to excuse blacks; *prima facie* case established), *People v. Freeman* (1987), 162 Ill. App. 3d 1080, 1094, 516 N.E.2d 440, 449; (12 of 18 blacks excused; *prima facie* case established).

In addition to the foregoing, the record reflects that the five black venire members who were peremptorily challenged were heterogeneous in character, with their only common characteristic being their race. The record discloses that the blacks excused were men and women of diverse backgrounds. Two were gainfully employed up to the day of the *voir dire*; one was a college student and two were unemployed. Four had no reservations about the death penalty, and even the single member who did stated that it would not affect his ability to consider death as an applicable penalty.

The State, however, would have us believe that heterogeneity is absent simply because four of the five excused blacks were either vic-

tims of crime or had immediate family members or friends who themselves were victims of crime. This ostensible common denominator does not apply to the fifth excluded venire member. But, more significantly, when we review the background of the selected jurors, we find that four of the nonblack jurors who were selected had similarly been victims of crime or had immediate family members or friends who were victims of crime, and three had expressed reservations about the death penalty.

■ The State urges that there was no *prima facie* showing in the present case because a single black was selected as a juror. Contrary to the State's assertion, our supreme court has stated that the presence of blacks on the jury does not preclude a finding that defendant has established a *prima facie* case (*Harris*, 129 Ill. 2d 123, 544 N.E.2d 357), nor does *Batson* require complete exclusion of a racial group to establish a *prima facie* case. See *People v. Johnson* (1990), 199 Ill. App 3d 798 (where a *prima facie* case of discrimination was found where six of the seven challenges by the State were against black venire members, although two blacks served on the jury).

■ The State asserts, presumably to demonstrate the unlikelihood of discrimination, that "many" of the witnesses were black. Notwithstanding the State's assertion, the record does not disclose the race of the witnesses and, therefore, we cannot speculate as to their racial composition. (See *Harris*, 129 Ill. 2d 123, 171, 544 N.E.2d 357, 378.) Even assuming, however, that some of the State's witnesses were in fact black, we do not find their race or the commonality in race between the defendant and the victim to be dispositive. See *People v. Johnson*, 199 Ill. App. 3d at 804 (wherein the court rejected a similar argument predicated on the fact that the prosecutor was black); *People v. Williams* (1990), 199 Ill. App. 3d 549, 556 (wherein, under comparable circumstances, the court rejected the contention that commonality of race between the victim and the defendant should be of controlling significance, stating:

> "[W]e find the commonality in race between the defendant and victim insufficient basis to destroy the inference of unlawful discrimination presented in the case at bar, given the great disparity in the State's use of peremptory challenges to exclude black as compared to white jurors, the predominantly white composition of the jury, and the heterogeneity of the excluded black jurors").

■ Our analysis of this matter was complicated by the fact that the trial court's determination that no *prima facie* case was established was based on an erroneous standard that a *prima facie* finding

required "100 percent exclusion." The record reflects that the jurors in this case were selected approximately two weeks after the United States Supreme Court's decision in *Batson* was handed down and before its thrust was fully developed and disseminated.

Under ordinary circumstances, evidentiary findings of the trial judge in determining whether a *prima facie* case of discrimination was established are to be given significant deference. In *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, our supreme court stated:

> "While reviewing the relevant circumstances of this case, we must keep in mind that the initial determination of whether a *prima facie* case has been established is left to the judgment of the trial judge, who is in a superior position to determine whether the prosecutor's exercise of peremptory challenges was motivated by group bias. 'We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors.' [Citation.] Trial judges are especially well suited to make this determination because they are familiar with local conditions and prosecutors, and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one."

(*Evans*, 125 Ill. 2d at 66-67, 530 N.E.2d at 1366-67.) This logic falters, where, as here, the trial judge followed an erroneous standard, since it cannot be presumed that the court weighed or considered all or any of the other relevant circumstances once he determined that the exclusion of blacks was less than 100%. In this sense, this case is not unlike those cases decided at trial before *Batson*, under pre-*Batson* standards, but which became subject to *Batson* while pending on appeal. (See, *e.g.*, *People v. Hooper* (1987), 118 Ill. 2d 244, 506 N.E.2d 1305 (Ryan, J., specially concurring).) Nevertheless, we acknowledge that the standard of review by which we are bound must apply to the correctness of the trial court's decision and not to the correctness of its stated reasons. See *Dvorson v. City of Chicago* (1970), 119 Ill. App. 2d 357, 256 N.E.2d 59.

▆▆ Accordingly, we conclude that the determination of the trial court that no *prima facie* case of discrimination was established is contrary to the manifest weight of the evidence.

Lastly, defendant contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter. Defendant now maintains that there was evidence that he was acting under sudden in-

tense passion resulting from "mutual combat." We disagree. As noted previously, defendant for purposes of appeal has dropped the contention made at trial that the provocation consisted of adultery.

■■■ Generally, mutual combat which may constitute adequate provocation to reduce murder to voluntary manslaughter (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358) has been defined as a "fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from the combat." (*People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15, 18.) Although slight evidence indicating voluntary manslaughter can justify the giving of the appropriate instruction (*People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373), that evidence must demonstrate more than slight provocation; the provocation must be serious enough so as to excite a reasonable person to intense passion. (*People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748.) Moreover, "where a defendant on slight provocation attacks a victim with violence that is out of proportion to the provocation, the mutual combat aspect of provocation does not apply as a matter of law." *People v. Ford* (1987), 163 Ill. App. 3d 497, 503, 516 N.E.2d 766, 770.

In this case, there is no evidence to warrant or require the tender of a voluntary manslaughter instruction. The only evidence which even tests this issue is defendant's own testimony. And, even his testimony does not sufficiently establish a provocation which would warrant or require the submission of that instruction to the jury.

■■ ■ By defendant's account, the victim first grabbed defendant by the collar. Defendant responded by pushing the victim away. According to the defendant, the victim again grabbed him and began to choke him. The choking ended when defendant asked the victim to leave the apartment. No further physical contact was initiated by the victim. In fact, according to defendant's own testimony, the victim went to the door. Once the victim was by the door, defendant pushed him twice without any evidence or testimony of a retaliatory response by the victim, other than his reluctance to leave. Thus, at this point, it was the defendant and not the victim who became the aggressor. Even where the victim starts out as the aggressor, a subsequent retreat will negate the inference that what may have started as mutual combat provoked the killing of the victim. (*People v. Yates* (1978), 65 Ill. App. 3d 319, 382 N.E.2d 505.) Moreover, defendant testified that he became angry, not because of any physical altercation with the victim, but because he was suspicious of something the victim had done with Jeanine. Thus, even by his own testimony, it was not the alterca-

tion or the quarrel that made him angry, but rather, his suspicion that the victim and Jeanine were "doing something." This suspicion of adultery was never substantiated by the evidence and, as stated previously, it was dropped by the defendant on appeal as support for his contention of entitlement to a voluntary manslaughter instruction.

Therefore, the trial judge was well justified when he determined that there was insufficient evidence to warrant a voluntary manslaughter instruction.

For the reasons stated, the judgment of the circuit court is remanded with directions to hold a *Batson* hearing wherein the State will explain the reasons for peremptorily challenging the black prospective jurors. If the trial court determines that the State excluded any of the black prospective jurors because of race, the defendant is entitled to a new trial. Conversely, if the trial court finds that the State did not use its peremptory challenges to exclude black prospective jurors because of their race, the defendant's conviction shall stand affirmed.

Remanded with directions.

MURRAY and LORENZ, JJ., concur.