THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROOSEVELT HUGHES, Defendant-Appellant.

First District (3rd Division)   No. 1—90—1307

Opinion filed December 29, 1993.

Michael J. Pelletier and Julian L. Berman, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Roosevelt Hughes, was found guilty of aggravated battery (Ill. Rev. Stat. 1989, ch. 38, par. 12—4) and sentenced to eight years in the Illinois Department of Corrections. Defendant now appeals. We reverse and remand for a *Batson* hearing with instructions to the trial court.

The issues that defendant raises for review are: (1) whether the trial court's finding that defendant failed to establish a *prima facie* case of racial discrimination by the State in the exercise of its peremptory challenges is contrary to the manifest weight of the evidence; (2) whether the trial court properly allowed the jury to view a photographic mug shot album while it was deliberating; and (3) whether defendant was proven guilty beyond a reasonable doubt. At about 11:15 p.m. on September 26, 1989, M.O., a 20-year-old white student at Loyola University (Loyola) in Chicago, Illinois, left the library and walked across the street to her dormitory known as Lake Front Hall. As she walked towards the elevator, she noticed that an African-American male was standing in the television room. M.O. entered the elevator. After the doors had closed slightly, an African-American male opened the doors. M.O. pushed the button for the sixth floor. The man did not press any of the buttons. Just before the elevator reached the sixth floor, however, he pressed the emergency stop button, stopping the elevator. He then touched her face and said: "You are really cute, honey." He then pushed her against the elevator wall.

M.O. attempted to escape from his grasp and pushed elevator buttons to open the elevator doors. She then screamed. The man told her to "shut up." He then removed a knife from his pants and gagged her with his left hand and waved the knife in her face, cutting her under the eye. Next, the man unzipped his pants and began tugging at M.O.'s jogging pants.

Approximately 20 to 30 seconds later, the doors were opened by a

male Loyola student. When the doors opened, he heard the perpetrator say, "she just tried to kill me," before dropping the knife in her bag and running out of the elevator. M.O. later gave the knife to a Chicago police officer.

Later that night, another Loyola student heard that M.O. had been assaulted. She went to M.O.'s room, where she spoke with M.O. and the police. The student told the police that she had seen an African-American male standing between the first and second set of doors of Lake Front Hall around 10:45 p.m. that night, after she returned to the dormitory from the library.

During the early morning hours of September 27, 1989, M.O. and the other Loyola student were taken to a police station where they looked through several photograph albums. The other Loyola student identified a photograph as depicting M.O.'s attacker, and M.O. then identified the same man in the photograph.

Defendant was arrested at his place of employment on September 28, 1989. On that same day, M.O. attended a lineup consisting of five individuals, whereupon she identified defendant. The male Loyola student who saw the perpetrator in the elevator when the doors opened on the night of the occurrence also viewed a lineup but he was unable to identify anyone.

During *voir dire*, the State exercised five peremptory challenges to strike the following venirepersons: Terry L. Clarke, Phyllis Parker, Limmie Reed, Larry Polk and Anderine Jones. Clarke, Parker, Reed and Polk all testified that they live on the South Side of Chicago.

Clarke testified that he rented his place of residence and had resided there for 15 years. Clarke further testified that he was unmarried. Clarke also told the court that he had three children, ages two, five and seven, and that he was presently unemployed but that he did a few different jobs when working. Clarke further testified that he played basketball and reads Sports Illustrated magazine in his spare time.

Next, Parker testified that she was in the process of buying a home. Parker told the court that she worked as a post office carrier, that she was married and that she has children ages 19 through 31. Parker testified that her 31-year-old daughter is a registered nurse; her son aged 29 had just been discharged from the Army; her son aged 24 is a member of the armed forces; her 21-year-old daughter is a mail clerk in a law office; and her 19-year-old son is still in school. Parker testified that her husband did not work due to a disability. Parker further testified that her son-in-law is a Chicago police officer and that her youngest son was a victim of crime during the previous year, but that she could still be a fair and impartial juror.

Reed testified that he is single and that he works as a bartender at a Red Lobster restaurant and as a security guard for Marshall Field's department store in downtown Chicago. Reed testified that he rented his residence. Reed also testified that he attended Chicago State University for approximately $2^1/2$ years where he majored in computer science. He further testified that he reads Stereo and High Fidelity magazines and that his hobby is bowling.

Polk testified that he is single and that he had resided at his present address for eight months. Polk told the court that he works for Windy City Day Labor. Polk testified that he has never served as a juror. Polk also said that he reads the Chicago Tribune, Success Opportunities, Ebony and Jet.

Anderine Jones testified that she has resided in the western suburbs for the past three years where she owns her own home. Jones told the court that she is single. Jones testified that she earned a bachelor's degree from the University of Illinois and that she works for Turner Construction Company, where she is an affirmative action officer. Jones further testified that her hobby is interior decorating and that she reads interior decorating publications.

The State exercised five out of its seven peremptory challenges to exclude African-Americans, and the two who were not African-American, Elizabeth Markey and Anna Johnston, were challenged by the defense as well. In addition, the trial judge indicated that he would have excused Markey for cause. Thus, except for the two white persons who were stricken by both the State and the defense, all of the State's peremptory challenges were used to exclude African-Americans. Three African-Americans served on the jury.

In order to establish a *prima facie* case of racial discrimination by the prosecution in the exercise of its peremptory challenges, a defendant need only prove relevant circumstances which raise a reasonable inference that the State used its peremptory challenges to exclude a member of the venire on the basis of race. (*Powers v. Ohio* (1991), 499 U.S. 400, 416, 113 L. Ed. 2d 411, 429, 111 S. Ct. 1364, 1373-74; *People v. Sprawls* (1992), 240 Ill. App. 3d 165, 167, 608 N.E.2d 129, 131; *People v. Kindelan* (1991), 213 Ill. App. 3d 548, 552-55, 572 N.E.2d 1138, 1140-42.) Relevant circumstances which the trial court should consider include: a pattern of strikes against African-Americans; the level of African-American representation in the venire as compared to the resulting jury; whether the African-Americans who were excluded were a heterogeneous group sharing race as their only common characteristic; prosecutorial questions and statements during *voir dire* and while exercising challenges; and the race of the defendant, the victim and the witnesses. (*Sprawls*, 240 Ill.

App. 3d at 167, 608 N.E.2d at 131; see also *Batson v. Kentucky* (1986), 476 U.S. 79, 97, 90 L. Ed. 2d 69, 88, 106 S. Ct. 1712, 1723; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172, 1184; *People v. McDonald* (1988), 125 Ill. 2d 182, 196, 530 N.E.2d 1351, 1357; *People v. Evans* (1988), 125 Ill. 2d 50, 63, 530 N.E.2d 1360, 1365; *People v. Green* (1992), 228 Ill. App. 3d 849, 853, 593 N.E.2d 844, 847; *People v. Dukes* (1992), 227 Ill. App. 3d 988, 990, 592 N.E.2d 437, 438; *Kindelan*, 213 Ill. App. 3d at 552-55, 572 N.E.2d at 1140-41.) The disproportionate exclusion of African-Americans is also a relevant and important factor supporting an inference of discrimination. (*People v. Hope* (1990), 137 Ill. 2d 430, 463-64, 560 N.E.2d 849, 864; *Sprawls*, 240 Ill. App. 3d at 168, 608 N.E.2d at 132; *People v. Harris* (1989), 182 Ill. App. 3d 114, 118, 537 N.E.2d 977, 980; *People v. Seals* (1987), 153 Ill. App. 3d 417, 423, 505 N.E.2d 1107, 1111.) A trial court's determination as to whether a *prima facie* case of discrimination has been established, however, will not be reversed unless it is contrary to the manifest weight of the evidence. *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184; *Sprawls*, 240 Ill. App. 3d at 167, 608 N.E.2d at 131; *Kindelan*, 213 Ill. App. 3d at 553, 572 N.E.2d at 1141.

■ We are not persuaded by the State's argument that defendant waived his right to appellate review of this issue because there is an insufficient record with respect to the racial composition of the jury and the venire. In *People v. Green* (1992), 228 Ill. App. 3d 849, 853-54, 593 N.E.2d 844, 847, this court held that although the record was unclear as to whether any African-Americans were selected as jurors, the existence of other relevant circumstances was sufficient to require the State to provide race-neutral justifications for the use of peremptory challenges against African-Americans. Similarly, in *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 710-11, 558 N.E.2d 1345, 1351-52, we held that the record was sufficient to find that defendant had made the *prima facie* showing required by *Batson* although the record did not reflect the racial composition of the entire venire. Accordingly, we will review this issue.

The venire consisted of 27 persons. Ten were African-American. The State exercised seven peremptory challenges. Five of the challenges were used to strike African-Americans, as opposed to two peremptory challenges used to strike white venirepersons who were challenged by the defense as well. The State excluded five African-Americans out of a total of eight who were tendered by the defense. In contrast, the State did not exercise peremptory challenges against any white prospective jurors tendered by the defense. The record shows that there was a disproportionate exclusion of African-Americans in relation to whites, as well as a pattern of peremptory

strikes against African-Americans. Further evidence of discrimination is found if we consider the heterogeneity of the excluded African-Americans. (See *People v. Sprawls* (1992), 240 Ill. App. 3d 165, 168, 608 N.E.2d 129, 132.) The venirepersons were both male and female and they had varying marital statuses. Their occupations were also varied. The group included a post office carrier; a bartender/security officer; a day laborer; an affirmative action officer of a construction company; and a venireperson who was unemployed at the time of *voir dire* but who when working did different jobs. The principal characteristic shared by all of the venirepersons in question was their race. The venirepersons who were stricken were a heterogeneous group sharing race as their most significant apparent common characteristic, thus supporting the existence of a *prima facie* case. See *People v. Lockhart* (1990), 201 Ill. App. 3d 700, 710, 558 N.E.2d 1345, 1351.

■ We do not agree with the State's contention that defendant failed to present a *prima facie* case because three of the venirepersons who became jurors were African-American. *Batson* does not require the complete exclusion of a protected racial group to establish a *prima facie* case of racial discrimination. (*Lockhart*, 201 Ill. App. 3d at 712, 558 N.E.2d at 1352-53; *People v. Seals* (1987), 153 Ill. App. 3d 417, 422-23, 505 N.E.2d 1107, 1111.) A prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large. (*Powers v. Ohio* (1991), 499 U.S. 400, 406, 113 L. Ed. 2d 411, 422, 111 S. Ct. 1364, 1368.) The exclusion of even one minority venireperson on account of race is unconstitutional and requires reversal. (*People v. Harris* (1989), 129 Ill. 2d 123, 175, 544 N.E.2d 357, 380.) Accordingly, we conclude that there was a *prima facie* case of racial discrimination and that the trial court's ruling was contrary to the manifest weight of the evidence.

For the reasons stated, the trial court's ruling on the issue of whether defendant established a *prima facie* case of racial discrimination in the selection of the jury is reversed, and the cause remanded to conduct a *Batson* hearing and whatever further proceedings, if any, the trial court determines are proper.

■ We next address the question of whether the trial court erred in allowing the jury to view a mug shot album while it was deliberating. Defendant contends that the court erred when it allowed the book to be viewed by the jury because its prejudicial effect outweighed its probative value as it suggested that defendant had been involved in prior criminal activity.

Prior to trial, the parties agreed that if the mug book was going to be admitted into evidence, the words "known sex offenders" and

similar phrases would be removed. When the book was admitted into evidence, it contained only pictures and no words. In addition, all witnesses were instructed to refer to the mug book as a "photo book." During the trial, the photo book was marked as an exhibit and was referred to during the testimony of the victim, the other female witness and a police detective. At the close of the State's case, the photo book was admitted into evidence. The jury later asked to see the photo book during its deliberations. The court granted the jury's request over defendant's objection. Defendant only takes exception to the trial court's decision to send the photo book to the jury. He does not complain now and he had no objection during trial to the admission of the photo book into evidence.

While "mug shots" may suggest that a defendant was involved in other criminal activity, they may be admitted where they are probative of the issue of a defendant's identity and the manner in which an identification was made. (*People v. Robinson* (1984), 125 Ill. App. 3d 1077, 1079, 467 N.E.2d 291, 293.) The decision to submit exhibits to the jury is within the discretion of the trial court. *Robinson*, 125 Ill. App. 3d at 1079, 467 N.E.2d at 293.

In the present case, there was no abuse of discretion by the trial court as defendant was not prejudiced by the jury's viewing the photo book during its deliberations. A central theory of defendant's case was that he was mistakenly identified by the witnesses. The jury had already heard testimony about the photo book and its contents and the photo book only contained photographs; all pages with words on them had been removed. Accordingly, the trial court did not err in allowing the jury to examine the photo book. See *People v. Davis* (1988), 173 Ill. App. 3d 300, 306 (it was proper to send a police photo book to the jury room (1) so that the jury could observe the accuracy with which the witness identified the defendant; (2) because the jury heard testimony about the book; and (3) because the jury requested the book).

Defendant cites *People v. Graham* (1989), 179 Ill. App. 3d 469, 509, 534 N.E.2d 1382, 1391, and *People v. Williams* (1966), 72 Ill. App. 2d 96, 102, 218 N.E.2d 771, 774-75, in support of his position; however, both of these cases are distinguishable from the present case. In *Graham*, there were repeated improper references to "mug shots" and a "mug book." In the present case, the book in which defendant's picture was mounted was referred to as a photo book throughout the course of the trial. Furthermore, unlike the *Williams* case, the photograph of defendant in the present case did not depict the fact that he had been previously arrested and charged with the commission of another crime.

■ The last issue raised by defendant is whether the evidence admitted at trial was sufficient for a jury to conclude that defendant was guilty beyond a reasonable doubt. We conclude that the evidence which we have discussed was sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt. This does not mean that we are making a finding as to defendant's guilt or innocence which will be binding in the event there is a retrial because of the *Batson* issue, but rather, our consideration of the sufficiency of the evidence admitted at trial will protect defendant's constitutional right against double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10, 391 N.E.2d 366, 375; *People v. Hammock* (1984), 121 Ill. App. 3d 874, 882-83, 460 N.E.2d 378, 384-85.

We remand this case with directions that the State be given the opportunity to come forward with a neutral explanation for the exclusion of the African-American prospective jurors. If the trial court decides that the State has not come forward with a neutral explanation for the exercise of its peremptory challenges excluding the African-American prospective jurors, the trial court is to vacate the conviction and grant defendant a new trial. If the trial court decides that the State has come forward with a neutral explanation for the exercise of its peremptory challenges excluding the African-American prospective jurors, and the neutral explanation is sufficient to rebut defendant's *prima facie* case of purposeful racial discrimination, then defendant's conviction will stand. Defendant then may appeal any alleged error that is made in the trial court after the remandment. See *People v. Freeman* (1987), 162 Ill. App. 3d 1080, 1094, 516 N.E.2d 440, 449.

For the above reasons, this matter is reversed and remanded with instructions to the trial court.

Reversed and remanded with instructions.

CERDA and GREIMAN, JJ., concur.