Orlando ROSA, Petitioner–Appellee,

v.

**Howard A. PETERS, III, Director, Illinois Department of Corrections, Respondent–Appellant.**

No. 92–3258.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1993 *.

Decided Sept. 23, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Nov. 30, 1994.

---

**3.** *Arizona v. Fulminante,* 499 U.S. 279, 290–91, 111 S.Ct. 1246, 1254–55, 113 L.Ed.2d 302 (1991) (White, J., dissenting in part).

**4.** *See Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) (holding that federal courts owe deference to the findings of fact of state courts on habeas review).

\* This case was briefed separately but argued together with *Green v. Peters,* No. 92–2856 [36 F.3d 602]; *Carter v. DeTella,* No. 92–2978 [36 F.3d 1385]; *Cuevas v. Washington,* No. 92–3090 [36 F.3d 612]; and *Everette v. Roth,* No. 92–4063 [37 F.3d 257].

Lawrence C. Marshall (argued), Northwestern University Legal Clinic, Tina Liebling, Office of the Cook County Public Defender, Chicago, IL, for petitioner-appellee.

Arleen C. Anderson, Terence M. Madsen, Asst. Attys. Gen., Martha E. Gillis (argued), Office of the Atty. Gen., Crim. Appeals Div., Chicago, IL, for respondent-appellant.

Before FAIRCHILD, COFFEY and RIPPLE, Circuit Judges.

FAIRCHILD, Circuit Judge.

Petitioner-appellee Orlando Rosa ("Rosa") was convicted of murder and attempted murder in Illinois state court following a jury trial. Rosa challenges the murder conviction, contending that the instructions given his jury violated his federal due process rights. Rosa also asserts that the prosecutor improperly excluded Blacks from his jury as forbidden by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and extended by *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Howard Peters, the Director of the Illinois Department of Corrections, appeals from a judgment of the district court granting Rosa's petition for a writ of habeas corpus.[1] We vacate the judgment, and remand for further proceedings on the *Batson* grounds only.

## I. BACKGROUND

### A. Facts

Rene Aguinaga ("Rene") testified that on the evening of August 9, 1985, he was in his backyard with his brother Jamie[2] and Isidoro Perez ("Perez") drinking beer. Around 12:45 a.m., there was shouting from the alley behind their backyard. From one side, Rene heard "Spanish Gangster Disciple Nation" and from the other, "Latin King, Latin King love," both phrases referring to street gangs. The Spanish Gangster Disciples and Latin Kings are rival gangs. The Aguinaga brothers and Perez were Latin Kings.

Rene saw people yelling "Latin Kings" run down the alley, but did not recognize any of them. Rene, followed by Jamie and Perez, walked into the alley to see what was happening; they went to the alley's south end and beyond. They then turned around to return to the Aguinaga house because it appeared that everything was over. When they reached the mouth of the alley, Rene stopped to use a washroom, and Jamie and Perez continued to walk. After Rene finished and returned to the alley, he saw that as Jamie and Perez were about two lots in from the mouth of the alley, three men came out of a yard yelling "Gangster Disciples." They were facing Jamie and Perez, about fifteen feet away. Rene then heard yelling ("G.D." for "Gangster Disciples") and heard two shots. Jamie ran to Rene and said he was "hit." The two ran to a friend's house, and called an ambulance for Jamie. Rene did not have a weapon, and saw none on Jamie or Perez.

Jamie Aguinaga testified that he did not recognize the people who ran by in the alley, and did not know if they were gang members. When he and Perez were returning to the backyard, three men came out from a yard about fifteen feet in front of them. Jamie had seen them before, and knew one as "Puerto Rican Roger" (Roger Gonzalez).[3] The three were yelling. When Jamie saw a gun in Gonzalez's hand, he turned away, and Gonzalez shot; Jamie felt pain in his left thigh. He then started running; he turned

---

1. Because the Illinois Attorney General represents Mr. Peters, we will refer to respondent-appellant as "the State."

2. We note that the Illinois Appellate Court and the district court refer to "Jaime." We use "Jamie," as he spelled it for the record when he testified.

3. That morning, at the hospital, Jamie identified Roger Gonzalez from photographs for the police.

back to look, and saw Rosa had a gun.[4] As he continued to run, he heard gunshots.

Arthur Rodriguez ("Arthur"), a member of the Spanish Gangster Disciples, testified that on the evening of August 9, 1985, he went with seven or eight friends, including Rosa, to Hammond, Indiana to buy beer. After buying beer and returning to the car, two cars filled with Latin Kings drove up. Because they were outnumbered, the Spanish Gangster Disciples ran. After returning to Chicago, fifteen to twenty gang members took a van to the neighborhood where the Aguinaga brothers lived, which was known to be a Latin Kings area.

The men got out of the van, and as they were going down the alley behind the Aguinaga home, a big group came out of one of the yards. Arthur and his friends began to back up. The group was yelling "D/K" for "Disciple Killers." Arthur knew they were Latin Kings. Arthur turned around and ran; a brick was thrown, almost hitting him. Arthur ran to the van, which drove off. Arthur did not notice if Rosa, Gonzalez or Pedro Rodriguez got back into the van.

Another Spanish Gangster Disciple testified that Rosa, Gonzalez and Pedro Rodriguez were in the van that went to the Latin Kings area. Rosa said he had a gun. As the van emptied, Rosa, Gonzalez and Rodriguez split from the group. The rest of the group was walking into the alley when the Latin Kings came out, and the Spanish Gangster Disciples ran.

Juan Garcia, a Chicago Police Officer, arrived on the scene at about 1:00 a.m., and found Perez face down in a backyard off the alley. Perez had been shot in the lower left back. Garcia asked Perez who had shot him, and he replied, "Puerto Rican Roger." Perez died later as a result of the gunshot wound. When Garcia asked Jamie at the hospital who had shot him, Jamie said "Puerto Rican Roger."

Rosa was arrested the next night. After informing Rosa of his *Miranda* rights, Assistant State's Attorney James Andreou ("An-

dreou") interviewed Rosa at about 1:30 a.m. on August 12. Detective George Basile of the Chicago Police Department was present. Andreou took down a written summary of his discussion with Rosa, which statement Rosa reviewed and signed. The statement reads:

> At about 1:00 a.m. on 10 August 1985 he was with Pedro Rodriguez and Roger Gonzalez in the alley behind Muskegon Avenue south of 89th Street. They were walking south. As they approached 90th Street they saw a group of guys coming north into the alley. Orlando Rosa heard someone shout "Get them" and heard gunshots. Then Orlando started shooting and Roger was shooting also. The guys who had been coming north turned around and began to run out of the alley. One of them fell to the ground. Orlando Rosa and his two friends Rodriguez and Gonzalez chased after the others but they got away. Later that morning Orlando Rosa talked with his girlfriend Patricia Marcardo and told her he thought he got one of them because he heard him scream and run off. He also said the same thing to Theodore Gonzalez and said that he had the back-up gun. Rosa, Pedro Rodriguez and Roger Gonzalez went to a bar named "Ritchie[']s" at 88th and Houston. There was a large group of people there and Orlando Rosa and Roger Rodriguez each said that they thought they had gotten one of them. While Orland[o] Rosa was at "Ritchie's" he got into a fight with a guy named Robert who hit him in the head with a brick. At the time of the fight Orlando Rosa had his gun on him but after he was hit on the head he was knocked unconscious and when he woke up at the hospital his gun was gone.

Tr. at 454–455. Andreou and Detective Basile testified that during the conversation with Rosa preceding the statement, he told them that he and his friends were out to get revenge for the Hammond incident when they went to the Latin Kings area. After signing the written statement, Rosa remarked that "he knew we [the police] had his

---

4. Two days after he was shot, Jamie picked Rosa and Pedro Rodriguez out of a police lineup as the

two men who had been with Roger Gonzalez.

girlfriend and she wasn't going to lie for him and he wanted to tell the truth and get this over with." *Id.* at 440.

### B. Jury Instructions

Rosa's jury was given the then current Illinois Pattern Jury Instructions on murder and voluntary manslaughter based on an unreasonable ·belief of justification.[5] Ill. Pattern Jury Instructions, Criminal IPI, No. 7.02 ("Issues in Murder") and No. 7.06 ("Issues in Voluntary Manslaughter—Intentional—Belief of Justification") (2d ed. 1981). Rosa's jury was also instructed on attempted murder and self-defense.[6]

The murder instruction listed the elements of murder and told the jury that the State must prove them beyond a reasonable doubt. The voluntary manslaughter instruction listed the elements of voluntary manslaughter and told the jury that the State must prove them beyond a reasonable doubt. The elements of voluntary manslaughter include all the elements of murder (except for murder while committing an offense), and also include the element (in Rosa's case) that defendant acted under an unreasonable belief that circumstances existed which would have justified the killing (sometimes referred to as "mitigating" because, in a sense, it is a defense to murder).[7] The ·jury was not told that it could not convict of murder unless the State disproved the mitigating element beyond a reasonable doubt.

These instructions are the same as those considered in *People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988),

and *Falconer v. Lane*, 905 F.2d 1129, 1136 (7th Cir.1990), except that in those cases the jury was also instructed on voluntary manslaughter based on serious provocation; that instruction placed the burden on the State to prove that the defendant acted under a sudden and intense passion resulting from serious provocation by another.

In *Reddick*, the Illinois Supreme Court held that when these murder and voluntary manslaughter instructions are given without warning the jury that it could not convict of murder unless the State disproved the mitigating elements, they "erroneously state the burdens of proof on the issues of whether the defendants acted under either intense passions or unreasonable beliefs that their actions were justified." 122 Ill.Dec. at 5, 526 N.E.2d at 145. "These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating mental state is proved, it will have been proved by the defendant, not the People." *Id.* The court concluded that "grave error" had occurred. *Id.* at 7, 526 N.E.2d at 147.[8]

Subsequently, this court held that when the same instructions are given, they violate federal due process because a jury may have been left with the false impression that it could convict of murder even if there was a mitigating mental state. *Falconer*, 905 F.2d at 1136; *see also Verdin v. O'Leary*, 972 F.2d 1467, 1470 (7th Cir.1992); *Flowers v. Ill. ·Dep't of Corrections*, 962 F.2d 703, 705 (7th

---

**5.** The Illinois statutes regarding murder and voluntary manslaughter were rewritten, effective July 1, 1987, to create the offenses of first degree murder and second degree murder.

**6.** Under the relevant section of the Illinois Code

[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. Ill.Ann.Stat.1991 ch. 38, para. 7–1. The Illinois Pattern Jury Instruction on self-defense follows

the statutory language. Ill. Pattern Jury Instructions, Criminal IPI, No. 24–25.06 ("Use of Force in Defense of a Person") (2d ed. 1981).

**7.** Under the relevant section of the Illinois Code

[a] person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this · Code [Justifiable Use of Force; Exoneration] ¨ [footnote omitted], but his belief is unreasonable.

Ill.Ann.Stat.1985 ch. 38, para. 9–2(b).

**8.** The Illinois Pattern Jury Instructions were rewritten to conform to *Reddick*.

Cir.1992), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993), *on remand,* 5 F.3d 1021 (7th Cir.1992); *Taylor v. Gilmore,* 954 F.2d 441, 450 (7th Cir. 1992), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993), *on remand,* 4 F.3d 997 (7th Cir.1993) (Table); *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 682 (7th Cir.1991); *Rose v. Lane,* 910 F.2d 400, 402 (7th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990).

### C. Procedural History

The jury convicted Rosa of the murder of Isidoro Perez and attempted murder of Jamie Aguinaga. The Illinois Appellate Court found that while the instructions were error under *Reddick,* the error was harmless because "[t]he evidence does not indicate that defendant's life was in danger or that he acted in self-defense." *People v. Rosa,* 206 Ill.App.3d 1074, 151 Ill.Dec. 950, 956, 565 N.E.2d 221, 227 (1990). It also ruled, with respect to the *Batson* issue, that Rosa had not met his burden, imposed by state law, of making an adequate record of the racial composition of the venire and seated jurors. The Illinois Supreme Court denied Rosa's petition for leave to appeal, and the United States Supreme Court denied his petition for certiorari.

Subsequently, Rosa filed a petition for a writ of habeas corpus in federal district court. The district court granted Rosa's petition on the instructional error, concluding that the instructions " 'so infected the trial as to violate due process.' " Aug. 26, 1992 Mem. and Order at 12. The district court

also granted Rosa's petition with respect to the *Batson* issue. The State now appeals.

## II. DISCUSSION

### A. Harmless Error

■ Rosa would like us to read *Falconer* broadly, as holding that when these murder and voluntary manslaughter instructions are given without alerting the jury to the need to determine whether the mitigating circumstance of an unreasonable belief of justification was present, and if present not to convict of murder, and the jury convicts of murder, there is always a denial of federal due process,[9] and never harmless error, no matter how slight the evidence of an unreasonable belief of justification.[10]

Several considerations militate against so broad a reading. First, the court in *Falconer* spoke in terms of a possibility that a jury would improperly convict of murder, and suggested that there was substantial evidence that the defendant, who attempted to prove that she killed in self-defense, did have a mitigating mental state:

> The central point is that the jury *might* have decided to convict the petitioner of murder because the State proved that she intentionally killed another without a reasonable belief that she acted in self-defense—*despite clear proof* that the petitioner was provoked to murderous passion by the victim or that the petitioner held an unreasonable belief that she was justified in killing the victim.

*Falconer,* 905 F.2d at 1136 (emphasis added).

Additionally, even though in several cases we have noted the "inherently prejudicial" nature of the instructions,[11] all subsequent

---

**9.** There is a serious question as to whether Rosa presented his federal due process claim to the state courts. The State, however, does not raise this issue.

**10.** In *Falconer,* a panel of this court concluded that "[a]s the Eighth Circuit stated in finding constitutionally faulty jury instructions: 'Such error [a jury verdict based on an instruction that allows it to convict without properly finding the facts supporting each element of the crime] is not corrected merely because an appellate court, upon review, is satisfied that the jury would have found the essential facts had it been properly instructed. The error cannot be treated as harm-

less.' " 905 F.2d at 1137 (citing *United States v. Voss,* 787 F.2d 393, 398, *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986)).

**11.** *Rose v. Lane,* 910 F.2d at 402–403 (noting that *Falconer* found the instructions to be "gravely erroneous" and "inherently prejudicial"); *United States ex rel. Fleming v. Huch,* 924 F.2d at 683 (recognizing that *Falconer* and *Rose* found that the error was "inherently prejudicial"); *Taylor v. Gilmore,* 954 F.2d at 454 (recognizing that *Falconer, Rose* and *Fleming* found the instructions were "inherently prejudicial").

decisions of this court which have found *Falconer*-type denials of due process have considered whether the error was harmless and have evaluated the evidence in order to determine that it was not. *See Flowers v. Ill. Dep't of Corrections*, 962 F.2d at 705 ("Our review of the record confirms the state trial judge's apparent belief, given that he tendered a voluntary manslaughter instruction to the jury, that the evidence presented at trial could support either a voluntary manslaughter verdict or a murder verdict. Consequently, we conclude that the error at Flowers' trial was not harmless beyond a reasonable doubt ...," *id.* at 706); *Taylor v. Gilmore*, 954 F.2d at 450 (considering "whether the erroneous jury instructions ... were harmless beyond a reasonable doubt," *id.* at 454) ("Our review of the record confirms the trial judge's belief ["that there was enough evidence in the record to support mitigation to manslaughter"] ...," *id.*) (noting that "[h]ad there been insufficient evidence in that regard, the judge would not have been obligated to [give the manslaughter instruction] ...," *id.*); *United States ex rel. Fleming v. Huch*, 924 F.2d 679 ("A closer question than whether the jury instructions violated due process is whether that constitutional violation was harmless beyond a reasonable doubt," *id.* at 683) (concluding that because there was "substantial and uncontroverted" evidence of battered wife syndrome, which was basis for self-defense theory, the instructional error was not harmless, *id.*); *Rose v. Lane*, 910 F.2d at 402 ("we must decide ... whether the trial court's constitutional error was harmless," *id.* at 403) (concluding that because there was evidence that the defendant believed he was acting in self-defense, a jury might not have convicted him of murder if properly instructed, *id.*). Thus,

we have interpreted *Falconer* as permitting consideration of whether *Falconer*-type errors were harmless in light of the evidence before the jury.

■ Finally, the Supreme Court has decided that "the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." *Brecht v. Abrahamson*, — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).[12] There must be more than "a ' "reasonable possibility" ' that trial error contributed to the verdict"; habeas petitioners are entitled to habeas relief based on trial error only if the error resulted in "actual prejudice." *Id.* at —–—, 1721–1722. The question is whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at —, 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

■ We have Rosa's statement, in which he explains that as he came upon Jamie and Perez, he heard "get them" and gunshots. Rosa argues that the jury could infer that he thought Perez, Jamie and Rene were part of the threatening group and that the "Disciple Killers" were shooting at them. An inference that Rosa believed that Perez presented a danger to his life seems at least implausible.

There also was testimony that the Spanish Gangster Disciples were looking for revenge for the Hammond incident. There was testimony that Jamie and Perez were merely walking in the alley, with no evidence that they were armed or advancing in a threatening manner, when the three Spanish Gang-

---

12. While the issue in *Brecht* was whether a habeas petitioner was entitled to relief because the state improperly used his post-*Miranda* silence for impeachment purposes, the harmless error standard announced in *Brecht* applies to instructional error. *See Libby v. Duval*, 19 F.3d 733, 739–740 (1st Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 314, — L.Ed.2d — (1994); *Kontakis v. Beyer*, 19 F.3d 110, 116 (3d Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 215, — L.Ed.2d — (1994); *O'Neal v. Morris*, 3 F.3d 143, 145–147 (6th Cir.1993), *cert. granted in part*, — U.S. —, 114 S.Ct. 1396, 128 L.Ed.2d

70 (1994) (question presented: "Does state have burden of proving constitutional error to be harmless under *Brecht v. Abrahamson?*"). *But see Suniga v. Bunnell*, 998 F.2d 664, 667 (9th Cir.1993).

Prior to *Brecht*, the harmless error standard was whether federal constitutional error "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We apply *Brecht* here. *See Lockhart v. Fretwell*, — U.S. —, —, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

ster Disciples came out yelling. After shooting, the three chased Rene and Jamie.

There are indeed some questions of credibility in deciding the correct version of the facts. We do note that the jury must have found Rosa's version incredible in large part because it rejected the claim that he acted in self-defense.[13] Insofar as possible the habeas or appellate court shuns resolving credibility and weighing the evidence. Nevertheless, the *Brecht–Kotteakos* test for harmless error requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried under proper instructions.

The constitutional error perceived in *Falconer* was that "the jury may have been left with the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction" and that "[j]urors are therefore encouraged by the structure of the instructions to answer ... [the requirements of the murder instruction] first and then move on only if those requirements cannot be met." *Falconer*, 905 F.2d at 1136.

The *Falconer* error is present here. We conclude, however, that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict" and therefore was harmless.[14]

If in fact the jury rejected any claim that Rosa had even an unreasonable belief that the killing was necessary in self-defense, the error had no effect on the verdict. Assuming, however, that the instruction caused the jury to believe that it could convict of murder even if Rosa had such belief, or without considering whether he did, our review of the trial transcript satisfies us that the jury was not and would not have been persuaded that Rosa had such belief.

### B. Batson

During jury selection, twenty-three potential jurors were questioned. The prosecution exercised four peremptory challenges, three of which were used against Blacks. The defense objected and moved for a mistrial, pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court denied the motion, apparently on the ground that Rosa is a Latino and not black, and therefore could not complain of the exclusion of black jurors. The record does not show the racial composition of the rest of the twenty-three venire members or the twelve seated jurors.

In *Batson*, the Supreme Court held that a defendant in a criminal case could show that peremptory challenges of prospective jurors of his own race were unconstitutional discrimination. In *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court ruled that a defendant may raise a *Batson* challenge even if the defendant and the excluded jurors are not of the same race. Because Rosa's conviction was not yet final when the Supreme Court decided *Powers*, he may benefit from that ruling on collateral review. *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

■ The State argues that federal courts do not have jurisdiction to hear Rosa's *Batson* claim because the Illinois Appellate Court decided the issue on an independent and adequate state law ground, citing *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The State contends that Rosa was required under Illinois law to make a record of the racial makeup of prospective and impaneled jurors in order to preserve a claim of discrimination for appellate review.

Although under the law at that time the trial court was correct in deciding that Rosa could not make out a *prima facie* case because he and the excluded jurors were not of the same race,[15] the Illinois Appellate Court

---

**13.** Notwithstanding the evidence that Perez and Jamie identified Gonzalez as the shooter, no argument is made that the evidence is insufficient for any rational jury to find that Rosa fired the fatal shot.

**14.** The Illinois Appellate Court also found that the instructional error was harmless.

**15.** *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23 ("the defendant first must show ... that the prosecutor has exercised peremptory challenges

declined to consider his claim because he had failed to make a record of the race of the jurors and members of the venire other than the venire members who had been struck from the jury. The court did not discuss the fact that Rosa was precluded from making a *Batson* claim because he is not black.

The Illinois Appellate Court relied on a state procedural bar in determining that Rosa could not raise a *Batson* claim. *See Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). To be "adequate," the state rule must be "firmly established and regularly followed." *James v. Kentucky*, 466 U.S. 341, 348, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346 (1984); *Lilly v. Gilmore*, 988 F.2d 783, 785 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 116 (1993) ("a rule applied infrequently, unexpectedly, or freakishly may not constitute an independent and adequate state ground") (citing *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir.1990)).

Illinois appellate courts do not invariably reject a discrimination claim because a defendant failed to make a record of racial composition. *See e.g., People v. Hughes*, 257 Ill. App.3d 633, 195 Ill.Dec. 566, 628 N.E.2d 1030 (1993) (black defendant) (noting that failure to make a record of racial composition does not necessarily preclude appellate review, and remanding for *Batson* hearing); *People v. Ramirez*, 230 Ill.App.3d 231, 171 Ill.Dec. 884, 595 N.E.2d 12 (1992) (non-black defendant's trial was pre-*Powers*, but direct appeal was pending at time of *Powers* decision) (remanding for *Batson* hearing to discern prosecution's reasons for peremptory strikes although no record of racial composition of venire or jury); *People v. Green*, 228 Ill. App.3d 849, 171 Ill.Dec. 24, 593 N.E.2d 844 (1992) (black defendant) (remanding for *Batson* hearing although not clear if any Blacks were on jury); *People v. Gaston*, 227 Ill. App.3d 486, 169 Ill.Dec. 644, 592 N.E.2d 131

(1992) (black defendant) (remanding for *Batson* hearing although no record of racial composition of entire venire); *People v. Nicholson*, 218 Ill.App.3d 273, 160 Ill.Dec. 742, 577 N.E.2d 1313 (1991) (black defendant) (remanding for *Batson* hearing although race of three jurors not known); *People v. Lockhart*, 201 Ill.App.3d 700, 146 Ill.Dec. 1011, 558 N.E.2d 1345 (1990) (black defendant) (remanding for *Batson* hearing although no record of racial composition of entire venire). Additionally, the Illinois Supreme Court had, in considering claims of discrimination by black defendants in jury selection at trials prior to *Batson*, remanded cases on appeal after *Batson*, contrary to the State's claim of waiver by failure to establish the number of Blacks on the venire. *People v. Andrews*, 132 Ill.2d 451, 139 Ill.Dec. 469, 548 N.E.2d 1025 (1989).

Additionally, in another case where a nonblack defendant failed to make a record of racial composition before *Powers* was decided, the Illinois courts remanded for a hearing to determine whether the prosecution used peremptory challenges for discriminatory purposes. *People v. Pecor*, 213 Ill.App.3d 472, 157 Ill.Dec. 600, 572 N.E.2d 1064 (1991), *aff'd, People v. Pecor*, 153 Ill.2d 109, 180 Ill.Dec. 50, 606 N.E.2d 1127 (1992). *See also People v. Ramirez*, 230 Ill.App.3d 231, 171 Ill.Dec. 884, 595 N.E.2d 12 (1992).

In *Pecor*, the defendant's *Batson* challenge was denied by the trial court because he was white. He made no record of the racial composition of the venire or jury. *Powers* was decided while the defendant Pecor's appeal was pending in the Illinois Appellate Court, which remanded for a *Batson* hearing. The Illinois Supreme Court affirmed, noting that "[a]ny attempt to make a record here, or persist in his claim where the law was clearly to the contrary, would have been, at the time, a waste of judicial resources. We do not believe a defendant should have to anticipate

---

to remove from the venire members of the defendant's race").

The Illinois Appellate Court issued its decision on December 7, 1990, and Rosa filed a petition for leave to appeal to the Illinois Supreme Court. *Powers* was decided on April 1, 1991. The Illinois Supreme Court denied Rosa's petition on April 3. Rosa then filed a motion for reconsider-

ation in light of *Powers*, and subsequently moved for leave to cite *People v. Pecor*, 213 Ill.App.3d 472, 157 Ill.Dec. 600, 572 N.E.2d 1064 (1991) (discussed below) in support of his motion for reconsideration. On May 15, the Illinois Supreme Court granted Rosa leave to cite *Pecor*, and also denied his motion for reconsideration.

an eventual change in the law in order to preserve an issue for review." *Pecor*, 180 Ill.Dec. at 56, 606 N.E.2d at 1133.

The State would have us distinguish *Pecor* because here, the record is not clear that the trial judge denied Rosa's *Batson* challenge because Rosa is not black. After reviewing the transcript, we do not find the State's argument persuasive. While the trial judge did not explicitly state his reasons, the only challenge by the prosecution was that Rosa could not establish a *prima facie* case because he is not black.[16]

We find that the reason articulated by the Illinois Appellate Court for denying Rosa's *Batson* claim is not an "adequate" state ground. Illinois appellate courts do not uniformly bar *Batson* claims when a defendant has failed to make a record of racial composition. Also, the Illinois Supreme Court's decision in *Pecor* demonstrates that the record-preservation rule is not "adequate" in the limited situation where a non-black defendant like Rosa could not raise a *Batson* claim at the time of his trial (and here, could not raise the claim when the Illinois Appellate Court rendered its decision), but subsequently is entitled to raise a *Batson* claim because his appeal was pending on direct review when *Powers* was decided.

■ Under *Batson*, a defendant must first make a *prima facie* showing that the prosecutor used his peremptory challenges on the basis of race. A *prima facie* showing is made " 'by presenting facts and relevant circumstances that raise an inference that the government used the peremptory challenges in order to exclude venire members because of their race.' " *United States v. Mojica*, 984 F.2d 1426, 1449 (7th Cir.) (citation omitted), *cert. denied*, — U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). If a defendant makes a *prima facie* showing, the burden shifts to the prosecutor to give a race-neutral reason for his use of peremptory challenges. Finally, the trial court must determine whether the defendant has carried his burden of showing purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

■ The trial court did not determine that Rosa failed to make a *prima facie* showing that the prosecution used its peremptory challenges for racial reasons, but apparently ruled only that a *prima facie* case could not be established because of Rosa's race. Rosa's attorney made a timely objection, but was not allowed to pursue his objection and demand a race-neutral explanation from the prosecution at that time. Because *Powers* applies to Rosa, he is entitled to a ruling on whether he can satisfy the *Batson* elements and ultimately prove that the prosecution used purposeful discrimination when it exercised its peremptory challenges.[17] *See Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281 (7th Cir.1990) (ruling that *Batson*

---

**16.** After the prosecution argued that no prima facie case had been made because Rosa was not of the same race as the excluded jurors, this discussion followed:

[The Prosecution]: Judge, just for the record, by arguing that [Rosa is not of the same race as the excluded jurors] we are not conceding that there are no other reasons for the challenges, Judge.

[The Defense]: They are not indicating, they are not going to indicate what the reasons are, obviously.

[The Prosecution]: No prima facie case has been made.

The Court: All right.

[The Defense]: I ask for a mistrial.

The Court: Motion denied.

Tr. at 84–85.

**17.** While jury selection is associated with a trial, we do not believe that the Supreme Court would deem a *Batson* violation a "constitutional error of the trial type" so that we would apply the harmless error standard enunciated in *Brecht*. *See Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (systematic exclusion of blacks from grand jury not subject to harmless error analysis) ("when a petit jury has been selected upon improper criteria ... we have required reversal of the conviction because the effect of the violation cannot be ascertained," *id.* at 263, 106 S.Ct. at 623 (plurality opinion)); *Arizona v. Fulminante*, 499 U.S. 279, 294, 310, 111 S.Ct. 1246, 1256–57, 1265, 113 L.Ed.2d 302 (1991) (five justices concluding that harmless error analysis should apply to admission of an involuntary confession and four justices dissenting on that point, all citing *Vasquez* as example of constitutional error ("unlawful exclusion of members of the defendant's race from the grand jury") not subject to harmless error analysis); *Ramseur v. Beyer*, 983 F.2d 1215, 1225–1226 n. 6 (3d Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

applies to civil cases and remanding for determination of whether a *prima facie* case of discrimination could be shown), *cert. denied*, 501 U.S. 1205, 111 S.Ct. 2797, 115 L.Ed.2d 970 (1991).

The district court ordered Rosa released unless retried, but had found both that the murder-manslaughter instructions denied due process and that the prosecution's peremptory challenges may have been based on race. As discussed above, we conclude that Rosa is not entitled to release on account of the murder-manslaughter instructions. Logically the next step with respect to the *Batson* point would be a hearing in district court to determine whether the peremptory challenges were based on race. However, given the passage of time (more than six years) since Rosa's trial, a hearing to determine whether the jurors were excluded because of race may well be unsatisfactory. The district court should decide if a hearing would be productive; if so, the district court should conduct a *Batson* hearing. If Rosa carries his ultimate burden of proving that the prosecution used purposeful racial discrimination when it exercised its peremptory challenges, then the district court should order release unless retried within 120 days. If Rosa does not carry his burden, then relief should be denied. If the district court decides a hearing could not be satisfactory for determining the issue, the district court should order Rosa's release unless retried within 120 days.[18]

Accordingly, the judgment of the district court is VACATED and the cause REMANDED for further proceedings on the *Batson* grounds in accordance with this opinion.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's decision to vacate the judgment of the district court and to remand the case for further proceedings on the *Batson* issue. I respectfully dissent from the court's decision to deny further relief on the ground that the instructional error was harmless. In my view, the conclusion that

the instructional error is harmless is based on an impermissible substitution of the judgment of federal appellate judges on a factual matter for that of the state court jury. I do not believe a federal habeas court ought to intrude so drastically into the prerogative of the jury.

At the outset, it must be stressed that the analysis that follows presupposes the continued vitality of *Falconer v. Lane*, 905 F.2d 1129 (7th Cir.1990), in this circuit despite the Supreme Court's critique of that decision in *Gilmore v. Taylor*, — U.S. —, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). Until that matter is raised and briefed in plenary fashion, *Falconer* remains the law of the circuit and we must proceed accordingly.

In *Falconer*, a panel of this court held that the Illinois pattern murder instructions, earlier invalidated on state law grounds by the Illinois Supreme Court in *People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), also violated the Due Process Clause of the Fourteenth Amendment. The federal infirmity identified by this court in *Falconer* therefore was different from the state ground relied upon by the state court in *Reddick*. In *Reddick*, the Supreme Court of Illinois had taken the view that, as a matter of state law, the instructions should have placed on the government the burden of disproving beyond a reasonable doubt a mitigating mental state. By contrast, this court acknowledged that, as a matter of federal constitutional law, the burden of proof with respect to an affirmative defense may be placed on either party.[1] It held, however, that the pattern instructions were infirm because, although the murder instructions preceded the voluntary manslaughter instructions, they did not explicitly tell the jury that it could not return a murder verdict if it found that the defendant possessed a mitigating mental state. It was possible, concluded the court, for a jury to find that a defendant was guilty of murder without ever

18. Of course, if Rosa is retried, the instructional error at his first trial will become moot.

1. *See Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

considering whether he was entitled to the voluntary manslaughter conviction. Explicit misdirection on this scale, concluded the court, violates the Due Process Clause. In reaching this conclusion, the court relied principally on the Supreme Court's holding in *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). In that case, the Court had held that federal courts may not overturn a state conviction on the ground that the jury instructions were erroneous unless those instructions can be said to have infected the entire trial. *Id.* at 147, 94 S.Ct. at 400–01.

The issue before us today is whether the error identified in *Falconer* can be considered harmless. If it can be so considered, we must determine the applicable standard in making such a determination. In *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993), the Supreme Court, through the pen of the Chief Justice, held that "trial error" ought to be evaluated on habeas review under the standard enunciated earlier in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). "Trial error," the Chief Justice wrote, " 'occur[s] during the presentation of the case to the jury.' " *Id.* at ——, 113 S.Ct. at 1717 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307, 111 S.Ct. 1246, 1263–64, 113 L.Ed.2d 302 (1991)). It is susceptible to harmless error analysis because it may be quantitatively assessed in the context of the other evidence that is presented at trial. *Id.* As the Supreme Court set forth in *Brecht,* under this standard, a reviewing court must determine whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253). "At the other end of the spectrum," continued the Chief Justice, are structural defects in the trial mechanism that "infect the entire trial process," *id.,* —— U.S. at ——, 113 S.Ct. at 1717, and therefore require automatic reversal. "Trial error" usually involves the admissibility of evidence or the propriety of the argument of counsel. Here, however, we deal with another form of error that arises in the course of trial— instructional error. It is well established at

this point that instructional error must be assessed quite differently from other errors that arise in the course of trial. Some are "structural" in nature and not at all subject to harmless error analysis. *See Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) (holding that a constitutionally deficient reasonable-doubt instruction cannot be harmless error). On the other hand, other instructions that misstate the task of the jury in assessing the evidence before it are subject to harmless error analysis. *See Carella v. California,* 491 U.S. 263, 266–67, 109 S.Ct. 2419, 2421–22, 105 L.Ed.2d 218 (1989) (holding that an instruction that a rental car kept 5 days past the rental agreement "shall be presumed to have been embezzled" impermissibly shifts the burden of proof, but is subject to harmless error analysis); *Rose v. Clark,* 478 U.S. 570, 582, 106 S.Ct. 3101, 3108, 92 L.Ed.2d 460 (1986) (holding that an instruction that impermissibly shifts the burden of proof on the issue of malice in a murder prosecution is subject to harmless error analysis); *Sandstrom v. Montana,* 442 U.S. 510, 526–27, 99 S.Ct. 2450, 2460–61, 61 L.Ed.2d 39 (1979) (holding that constitutionally erroneous instruction establishing conclusive presumption that perpetrator intends the ordinary consequences of voluntary acts is subject to harmless error analysis). These cases make clear that, as the majority holds, *Falconer* error is subject to harmless error analysis. However, as I shall detail in the paragraphs that follow, application of the harmless error rule in these cases poses problems, both conceptual and practical, not faced when we deal with other types of error that arise in the course of trial.

As in the case of instructions that establish mandatory presumptions or instructions that shift the burden of proof, it is indeed difficult to assess the effect of an instruction such as that at issue in *Falconer* and the present case that explicitly skews the jury's decision-making process so that it might not even consider the mitigating circumstances that would result in acquittal of the principal charge and conviction only on the lesser included offense. When the traditional formulation of the harmless error test of *Kotteakos*

is applied uncritically to instructional error of the type presented by *Falconer*, the contours of harmless error analysis are radically expanded. Federal habeas courts consequently are placed in the position of supplying missing factual findings of the jury and, indeed, of relying on evidence to uphold the conviction that the jury may not have considered. *See Libby v. Duval*, 19 F.3d 733, 741 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 314, —— L.Ed.2d —— (1994) (Stahl, J., dissenting).

In the case of the usual forms of trial-type error such as erroneously admitted evidence or improper argument to the jury, the sort of quantitative assessment contemplated by *Brecht* is easily accomplished by the reviewing court. The court has before it the entire record and can easily determine whether the fact established by the erroneously admitted evidence was nevertheless established to an *overwhelming degree by other lawfully* admitted evidence; a judgment therefore can be made as to whether the erroneously admitted evidence had a substantial and erroneous influence on the jury's verdict. Such an approach is far more difficult when the appellate court is called upon not to assess the effect of information that the jury had before it but to assess the effect of the jury's not having considered relevant information or not having made a finding which the law requires it to make.

As I have already noted, it is clear from the established precedent that the difficulty in applying the standard *Kotteakos* approach does not mean that these instructional errors ought not be evaluated under a harmless error analysis. Nor does it mean that the holding of *Brecht* ought to be inapplicable in such instances. It simply means that an analytical approach, tailored more precisely to the nature of the particular error on the fairness of the proceedings, must be found. As Judge Stahl of the First Circuit has pointed out in his dissenting opinion in *Libby*, Justice Scalia's concurring opinion in *Carella v. California*, 491 U.S. 263, 267–73, 109 S.Ct. 2419, 2421–24, 105 L.Ed.2d 218 (1989), offers a formulation that is of considerable help in

this situation.[2] Because the inquiry is not whether guilt can be established from the record, but whether guilt was ever found properly by the jury, a reviewing court must determine that the instruction that could have misdirected the jury's efforts in such a drastic way did not play a role in its verdict. *Carella*, 491 U.S. at 270, 109 S.Ct. at 2423 (Scalia, J., concurring). Under this approach, instructional error that so grossly misdirects the jury's inquiry is harmless when it can be established that the facts that the jury necessarily found pursuant to other correct instructions are so closely related to the fact to be proved by the erroneous instruction that a rational jury could not have found the former facts without also finding the fact addressed by the erroneous instruction. In the case of an impermissible presumption, for example, the predicate acts established by correct instructions may so conclusively establish the requisite intent that no rational jury could conclude that the defendant committed the criminal act in question, but did not have the intent that was also the subject of the impermissible presumption. *See Carella*, 491 U.S. at 272, 109 S.Ct. at 2424 (discussing *Rose*, 478 U.S. at 579, 106 S.Ct. at 3106–07). In cases such as the one before us, in which the jury's inquiry was affirmatively skewed so that the jury might find the defendant guilty of murder without even considering the lesser included offense of manslaughter, the error might also be harmless when the evidence before the court simply did not permit a finding of manslaughter.

While the course of this circuit's approach to harmless error in the *Falconer* situation has perhaps not been a seamless garment, our cases, read as a whole, do recognize these principles. As the majority suggests, our cases do contain language that, taken alone, suggests that *Falconer* error can never be harmless. Notably, however, each of these cases did explore the possibility that the evidence of record might not reasonably raise the lesser included offense of manslaughter. *See Taylor v. Gilmore*, 954 F.2d 441, 454 (7th Cir.1992), *rev'd on other*

**2.** Justice Scalia was addressing in *Carella* an erroneous instruction that created a conclusive presumption. He noted, however, that his analy-

sis is applicable to other situations where the jury has been deprived of its fact-finding role. *Carella,* 491 U.S. at 270, 109 S.Ct. at 2423.

grounds, —— U.S. ——, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (noting that the error was "inherently prejudicial," but also examining the record to determine that the lesser included offense was raised by the evidence); *Fleming v. Huch,* 924 F.2d 679, 683 (7th Cir.1991) (same); *Rose v. Lane,* 910 F.2d 400, 403 (7th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990) (same). A later case makes no such reference to the impossibility of harmless error but, notably, approaches the harmless error analysis by asking whether the lesser included offense was reasonably raised by the evidence. *See Flowers v. Illinois Dep't of Corrections,* 962 F.2d 703, 706 (7th Cir.1992), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1993). Our present Chief Judge followed a similar analysis when, writing for the court in *United States v. Kerley,* 838 F.2d 932 (7th Cir.1988), he held that the district court's error in not instructing the jury with respect to one element of the offense was harmless because the element was "not contestable." *Id.* at 939.

The foregoing approach may well result in a determination of harmless error in substantially fewer instances than in the usual "trial error" situation. However, this difference in result is due to the difference in the problem presented. The Supreme Court has acknowledged that all errors cannot be neatly classified as either "structural" or "trial" errors. In *Brecht,* the Chief Justice, referring to Justice White's earlier observation in *Fulminante,*[3] noted that "structural" and "trial" errors were at opposite ends of the "*spectrum*" of constitutional errors. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717 (emphasis added). Explicit misdirection to the jury on its responsibility to consider the evidence tending to support acquittal on the principal charge and conviction on the lesser included offense is an error very different from the admission of tainted evidence. That it must be treated differently by a reviewing court ought not be surprising.

Justice Scalia's approach to error of this sort was formulated prior to *Brecht.* It is clear, however, that his analysis is not dependent upon a particular formulation of the standard of review. The Justice's opinion is an explanation of the particular dangers presented by instructions that deprive the jury of its fact-finding role—an explanation that makes clear that such an alteration in the jury's function cannot easily be neutralized because it is far closer to a "structural" error than the typical trial-type error. Certainly, allowing the approach urged by Justice Scalia in *Carella* to survive *Brecht* is compatible with the principles of judicial restraint and federalism re-emphasized in that opinion. As Judge Stahl points out, fact-finding by federal judges on habeas review is hardly evidence of judicial restraint. Nor is it required by a healthy concept of federalism. Federal courts are to respect the factual findings of the state courts,[4] not supplement them.

As the majority quite frankly admits, reliance on the harmless error doctrine in this case requires the judges of this court to perform a task that the jury may never have addressed because of the erroneous jury instructions. It requires that the panel resolve matters of credibility and weigh the evidence on the primary issue of guilt or innocence. Mr. Rosa has a right to have his guilt or innocence determined by a jury, not by federal appellate judges. Accordingly, I respectfully dissent.

---

**3.** *Arizona v. Fulminante,* 499 U.S. 279, 290–91, 111 S.Ct. 1246, 1254–55, 113 L.Ed.2d 302 (1991) (White, J., dissenting in part).

**4.** *See Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) (holding that federal courts owe deference to the findings of fact of state courts on habeas review).